# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2023

Lyle W. Cayce
Clerk

No. 22-40644

———————

VICKI BAKER,

*Plaintiff—Appellee*,

*versus*

CITY OF MCKINNEY, TEXAS,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:21-CV-176

———————————————————————

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

When an armed fugitive held a 15-year-old girl hostage inside plaintiff-appellee Vicki Baker's home, City of McKinney (the "City") police officers employed armored vehicles, explosives, and toxic-gas grenades to resolve the situation. The parties agree the officers only did what was necessary in an active emergency. However, Baker's home suffered severe damage, much of her personal property was destroyed, and the City refused to provide compensation.

No. 22-40644

Baker brought suit in federal court alleging a violation of the Takings Clause of the Fifth Amendment to the United States Constitution, which states that private property shall not "be taken for public use, without just compensation." The district court held that as a matter of law, the City violated the Takings Clause when it refused to compensate Baker for the damage and destruction of her property. The City timely appeals.

We conclude that, as a matter of history and precedent, the Takings Clause does not require compensation for damaged or destroyed property when it was objectively necessary for officers to damage or destroy that property in an active emergency to prevent imminent harm to persons. Baker has maintained that the officers' actions were precisely that: necessary, in light of an active emergency, to prevent imminent harm to the hostage child, to the officers who responded on the scene, and to others in her residential community. Accordingly, and despite our sympathy for Ms. Baker, on whom misfortune fell at no fault of her own, we REVERSE.

## I.

Baker was a long-time resident of McKinney, Texas when she made plans to sell her house and retire. She had already moved to Montana at the time of the events in question, July 25, 2020, and her adult daughter, Deanna Cook, was staying in Baker's McKinney home to prepare it for final sale. Baker's dog was also present at the home.

On the morning of July 25, Cook saw a Facebook post that Wesley Little was on the run with a 15-year-old female "runaway." Cook recognized Little because he "did some work inside of [Baker's] home more than a year before the incident occurred." Baker had fired him at that time because of comments that made Cook uncomfortable.

That same morning, McKinney police spotted Little driving a Corvette with the 15-year-old girl. Officers began pursuit, but "[i]t was a very

No. 22-40644

fast Corvette," and Little evaded police. He arrived at the Baker residence shortly thereafter with the 15-year-old girl and knocked on the door. Cook answered, and Little asked to come in and to put his car in the garage. Cook recognized the girl and, though frightened, formulated a plan to help: She agreed to let Little into the house, but then told him, falsely, that she had to go to the supermarket. Once away from the house, she called Baker and described the situation, and Baker called the police.

City police arrived soon after and, in the words of one of the officers, "set up perimeter on the home and essentially tr[ied] to secure it. And what we[] [were] doing [was] for the well-being of not only the 15-year-old girl, but the community as a whole." Officers employed a BearCat, which is an "armored personnel carrier," and engaged in "loud hailing" using an intercom system. Soon after, Little released the girl and she exited the house. The girl told police that "he's in the ceiling; she had pulled down the attic so he could get up there; they had a lot of long guns, some pistols; and that he was obviously high on methamphetamine."

Little somehow "communicated to" police that he "had terminal cancer, wasn't going back to prison, knew he was going to die, was going to shoot it out with the police." Police proceeded to use explosive devices, the BearCat, a T-Rex (similar to the BearCat), toxic gas grenades, and a drone to try to resolve the situation. After some time, the drone was able to reach a vantage point to see that Little had taken his own life.

It is undisputed that police acted unimpeachably that day, and no party in this case has ever suggested otherwise. At trial, Baker's attorney made it a point on direct examination to underline that "there was some really good police work here," it "was a successful operation," "[e]veryone followed procedure," and "[e]veryone did what they were supposed to do," along with other affirmations that the officers acted irreproachably. Her

3

No. 22-40644

attorney reiterated that the severe damage done to Baker's home "was necessary. No issue there." And in briefing, Baker makes clear she does not dispute that "it was necessary to destroy her house." In light of the way Baker has argued this case, we do not ourselves evaluate whether the damage to her home was "necessary"; we grant the parties' shared contention that it was.

Nevertheless, the damage to Baker's home was severe. As the district court explained, quoting Baker's motion for summary judgment, "[m]uch of the damage went beyond what could be captured visually." Specifically,

> The explosions left Baker's dog permanently blind and deaf. The toxic gas that permeated the House required the services of a HAZMAT remediation team. Appliances and fabrics were irreparable. Ceiling fans, plumbing, floors (hard surfaces as well as carpet), and bricks needed to be replaced—in addition to the windows, blinds, fence, front door, and garage door. Essentially all of the personal property in the House was destroyed, including an antique doll collection left to Baker by her mother. In total, the damage . . . was approximately $50,000.

Baker filed a claim for property damage with the City, but the City replied in a letter that it was denying the claim in its entirety because "there is no liability on the part of the City or any of its employees." Baker's insurance "would not cover any damage caused by the City's police, including the structural damage." Baker received numerous donations from businesses and others who had heard of her plight. She has maintained that if she should ever receive compensation from the City, she would pay back everyone who volunteered to help her.

On March 3, 2021, Baker filed suit against the City in federal court in the Eastern District of Texas for violations of the takings clauses of the United States and Texas Constitutions. She alleged liability under the Fifth

4

Amendment directly because it "is self-executing" under *Knick v. Township of Scott*, 139 S. Ct. 2162, 2171 (2019), and she also alleged liability under the Fifth Amendment via the vehicle of 42 U.S.C. § 1983. She contended the district court has jurisdiction over her federal constitutional claims under the federal-question statute, 28 U.S.C. § 1331, and supplemental jurisdiction over the state takings claim under 28 U.S.C. § 1367.

The City filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It argued that Baker has no cause of action under the Fifth and Fourteenth Amendments and that the City did not take Baker's property under the Fifth Amendment; that Baker's complaint failed to sufficiently allege *Monell* liability under § 1983;[1] that the district court lacks supplemental jurisdiction over the Texas Constitution claim; and that the Texas Constitution claim fails because "it is a sheer attempt to allege tort recovery in a claim wearing takings claim clothing." The district court denied the City's motion in full.

Baker filed a motion for partial summary judgment on her claims that the City is liable under the Fifth Amendment and the Texas Constitution. The district court granted it, holding that the City is liable directly under the Fifth Amendment and the Takings Clause of the Texas Constitution. The district court also held that "because the Fifth Amendment is self-executing, Baker's claim under the Fifth Amendment Takings Clause is not dependent upon the § 1983 vessel. Accordingly, the Court need not determine whether Baker established an official policy under *Monell*." (footnote omitted). But the district court explained in a subsequent order,

> because Baker also brought a claim under §1983, the Court considered this claim as well, ultimately finding an issue of fact

---

[1] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

that the Court declined to resolve at summary judgment. Further, the Court did not determine the amount of just compensation to which Baker is entitled. Accordingly, damages and the City's liability under § 1983 are issues that have been reserved for jury determination at trial.

At a pre-trial conference, the City "lodge[d] an objection on the *Monell* issues," claiming they have not "been adequately pled or presented in this case" and that the only thing left to try is the question of damages. The district court rejected this argument, stating that § 1983 "most certainly was pled. Without question, it's pled in the alternative."

At that same conference, the district court also noted that the City made an offer to Baker for "the full amount of damages" to settle the case. Baker refused because, her attorney said, "she wanted a change in policy or some assurance that people in her position in the future wouldn't be subjected to similar denial of compensation, and the City wasn't willing to offer that so that was why she proceeded."

Two weeks before trial, Baker filed a motion *in limine* to exclude evidence of donations or insurance proceeds she received to help repair her home. She cited the collateral source rule, which is a fixture of tort law, and equitable considerations. The district court agreed with Baker and granted the motion in full.

Trial was held from June 20 to 22, 2022. On June 21, the City submitted a motion for judgment as a matter of law along with a supplemental brief arguing that (1) Baker did not adequately plead a plausible § 1983 claim against the City and (2) Baker failed to show that her alleged constitutional injury was caused by an official city policy or custom, or by a city policymaker. The district court denied the motion.

No. 22-40644

The jury found that the City was acting under color of state law when it refused to compensate Baker for her lost property and that the City's refusal proximately caused Baker's damages of $44,555.76 for her home and $15,100.83 for her personal property. Because the district court had already found that the Fifth Amendment is self-executing, that the City's refusal to compensate Baker was a violation of the Fifth Amendment, and that the City's refusal was a violation of the Texas Constitution, Baker was given the option to elect whether to pursue the judgment under the Fifth Amendment directly, under § 1983, or under the Texas Constitution. Baker chose § 1983.

The City submitted a motion for a new trial on July 20, 2022. The court denied it on August 26, 2022. The City timely filed a notice of appeal on September 23, 2022, challenging all the district court's unfavorable decisions and orders stretching back to its denial of the City's 12(b)(1) and 12(b)(6) motions.

## II.

We begin with jurisdiction. The City contends that under our court's decision in *Devillier v. State*, 53 F.4th 904 (5th Cir. 2023), *cert. granted*, 92 U.S.L.W. 3063 (U.S. Sept. 29, 2023) (No. 22-913), federal courts lack jurisdiction over Baker's Fifth Amendment takings claim. This contention fails foremost because *Devillier* made no jurisdictional holding. *See id.* at 904. The district court was therefore correct to hold that it had federal-question jurisdiction in this case pursuant to 28 U.S.C. § 1331.[2]

This court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[2] The City also contends that the district court lacked supplemental jurisdiction over Baker's Texas Constitution claim pursuant to 28 U.S.C. § 1367. This contention fails because it is explicitly predicated on the claim that the district court lacked federal-question jurisdiction.

No. 22-40644

## III.

We turn now to the merits of Baker's Fifth Amendment claim.

a.

The City invites our court to adopt a broad rule: because Baker's property was damaged or destroyed pursuant to "the exercise of the City's police powers," there has been no compensable taking under the Fifth Amendment. We decline.

First, the City's broad rule runs afoul of our precedent. As we explained in *John Corp. v. City of Houston*:

> Appellants argue strenuously that their claims do not include a takings claim because they nowhere allege that the City used its power of eminent domain to take property for public use. Instead, Appellants assert that the city relied on its police powers to destroy their property. Such a distinction between the use of police powers and of eminent domain power, however, cannot carry the day. The Supreme Court's entire "regulatory takings" law is premised on the notion that *a city's exercise of its police powers can go too far, and if it does, there has been a taking.*

214 F.3d 573, 578 (5th Cir. 2000) (emphasis added). Indeed, the mere fact that Baker's property has been damaged or destroyed pursuant to the City's police power cannot decide this case.

Second, twentieth-century Supreme Court precedents cast doubt on the City's proposed rule. As the Court said in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992), if "the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared.'" (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("But that cannot be accomplished in

this way under the Constitution of the United States.")). Similarly, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982), the Court noted that a given regulation might be "within the State's police power. . . . It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid."

Third, the Court has noted that takings cases "should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 37 (2012) (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958)). The City's proposed rule is an exceptionally broad exclusionary rule. And it is broader than any rule necessary to decide this case.

Fourth, the Court has increasingly intimated that history and tradition, including historical precedents, are of central importance when determining the meaning of the Takings Clause. *See Tyler v. Hennepin County*, 598 U.S. 631, 637-44 (2023) (determining the applicability of the Takings Clause from "[h]istory and precedent" reaching back to the Magna Carta); *Horne v. Department of Agriculture*, 576 U.S. 350, 357-61 (2015); *see also Murr v. Wisconsin*, 582 U.S. 383, 419 (2017) (Thomas, J., dissenting) ("In my view, it would be desirable for us to take a fresh look at our regulatory takings jurisprudence, to see whether it can be grounded in the original public meaning of the Takings Clause . . . .").

The City's arguments for its broad rule are ahistorical. It relies primarily on recent precedents from our sister circuits, especially *Lech v. Jackson*, 791 F. App'x 711 (10th Cir. 2019) (unpublished). *See also Johnson v. Manitowoc Cnty.*, 635 F.3d 331 (7th Cir. 2011); *AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed Cir. 2008). The City is correct that these precedents have endorsed the rule the City now invites our court to adopt.

But with respect to our sister circuits, their opinions do not rely on history, tradition, or historical precedent, and moreover, the rule they adopt is inconsistent with our court's precedent. *Compare Lech*, 791 F. App'x at 717 ("[We] hold that when the state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking for purposes of the Takings Clause.") *with John Corp.*, 214 F.3d at 578 ("[A] city's exercise of its police powers can go too far, and if it does, there has been a taking.").

Our own analysis of history and precedent, undertaken below, further explains why we decline to adopt the City's broad rule. But first, we turn to Baker's arguments.

b.

Much of Baker's briefing is devoted to explaining why we should reject any categorical "police power" exclusion from Takings Clause liability. In the absence of such an exclusion, she claims, "like every other time the government's agents destroy property, a Takings analysis applies." And "[i]n this case, that analysis is straightforward: The damage was intentional and foreseeable, it was for the public use, and no recognized exception to liability applies."

Baker attends more closely to historical precedent than does the City. She specifically relies on *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. (11 Wall.) 166, 181 (1871), for the proposition that "where real estate is actually invaded . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." *Pumpelly* was an inverse condemnation case in the context of a dam, which Wisconsin had legislated to be built, that flooded the plaintiff's property. In that case, the Supreme Court said,

No. 22-40644

It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors.

*Id.* at 177–78.

But while we agree with Baker that *Pumpelly* further undercuts the City's proposed rule, it provides only limited help for Baker herself. To repeat, *Pumpelly* was a flooding case that dealt with a dam constructed pursuant to Wisconsin legislation. The facts of *Pumpelly* are facially distinct from those at bar, where officers damaged or destroyed Baker's property by necessity during an active emergency—an emergency that began as a hostage situation involving a child and evolved into a potential shootout in a residential neighborhood with a heavily armed fugitive.

What Baker needs, in other words, is historical or contemporary authority that involves facts closer to those at bar and where the petitioner succeeded under the Takings Clause. But Baker provides no such authority.

11

No. 22-40644

c.

When we turn to "[h]istory and precedent," *Tyler*, 598 U.S. at 639, we find that historically oriented legal scholarship has widely converged on the thesis that a "necessity" or "emergency" privilege has existed in Takings Clause jurisprudence since the Founding.[3]

───────────────────

[3] *See, e.g.*, William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 Hastings L.J. 1061, 1092 (1994) ("American courts and commentators consistently referred to a line of English cases making it 'well settled at common law' that in cases of calamity (e.g., fire, pestilence, or war) individual interests, rights, or injuries would not inhibit the preservation of the common weal. Thus, private houses could be pulled down or bulwarks raised on private property without compensation when the safety and security of the many depended upon it."); Shelley Ross Saxer, *Necessity Exceptions to Takings*, 44 U. Haw. L. Rev. 60, 67 (2022) ("[T]he common law defense of public necessity bars the rights of property owners to obtain recourse or compensation when government destroys private property for the public good."); Brian Angelo Lee, *Emergency Takings*, 114 Mich. L. Rev. 391, 391, 393 (2015) ("Remarkably, however, courts have repeatedly held that if the government destroys property to address an emergency, then a 'necessity exception' relieves the government of any obligation to compensate the owner of the property that was sacrificed for the public good. . . . Indeed, courts and scholars have said that [this] principle has been well-established law for centuries."); Susan S. Kuo, *Disaster Tradeoffs: The Doubtful Case for Public Necessity*, 54 B.C. L. Rev. 127, 127 (2013) ("When government takes private property for a public purpose, the Fifth Amendment of the U.S. Constitution requires just compensation. Courts, however, have long recognized an exception to takings law for the destruction of private property when necessary to prevent a public disaster."); Derek T. Muller, *"As Much Upon Tradition as Upon Principle": A Critique of the Privilege of Necessity Destruction Under the Fifth Amendment*, 82 Notre Dame L. Rev. 481, 483–85 (2006) (describing the "privilege of necessity destruction" which reaches to back to the common law and allows that "the government may destroy property in times of necessity during law enforcement, such as burning down a home to capture a barricaded criminal" without providing compensation); Note, *Necessity Takings in the Era of Climate Change*, 136 Harv. L. Rev. 952, 953 (2023) ("Since the earliest days of the Republic, U.S. courts have sanctioned violations of private property rights without compensation under conditions of public necessity. The quintessential application of this doctrine has been in the destruction of private property to create a firebreak . . . . But the principle . . . . has expanded beyond classical paradigms . . . to include activities [such as] law enforcement.").

For example, in *Respublica v. Sparhawk*, 1 U.S. 357 (Penn. 1788), the Pennsylvania Supreme Court considered a claim for compensation for 227 barrels of flour that had been moved by the government to a depot and later lost to the British. The court asked whether "by reason, by the law of nations, and by precedents analogous to the subject before us," compensation could be awarded. The court answered no, on the ground that "the rights of necessity, form a part of our law." *Id.* at 362. It explained,

> Of this principle, there are many striking illustrations. If a road be out of repair, a passenger may lawfully go through a private enclosure 2 Black. Com. 36. So, if a man is assaulted, he may fly through another's close. 5 Bac. Abr. 173. In time of war, bulwarks may be built on private ground. Dyer. 8. Brook. trespass. 213. 5 Bac. Abr. 175. . . . Houses may be razed to prevent the spreading of fire, because for the public good. Dyer. 36. Rud. L. and E. 312. See Puff. lib. 2. c. 6. sec. 8. Hutch. Mqr. Philos. lib. 2. c. 16. We find, indeed, a memorable instance of folly recorded in the 3 Vol. of Clarendon's History, where it is mentioned, that the Lord Mayor of London, in 1666, when that city was on fire, would not give directions for, or consent to, the pulling down forty wooden houses, or to the removing the furniture, &c. belonging to the Lawyers of the Temple, then on the Circuit, for fear he should be answerable for a trespass; and in consequence of this conduct half that great city was burnt.

*Id.* at 363. Given this principle of necessity, the court explained, "there is nothing in the circumstances of the case, which, we think, entitles the Appellant to a compensation . . . ." *Id.*

*Sparhawk* is a 1788 case. It is therefore directly on point to understanding the common law rights to just compensation against which the Fifth Amendment Takings Clause was ratified in 1791. And it articulates what appears to have been a guiding rationale for this common law necessity exception: the fear that if the state risks liability for the damage or destruction

No. 22-40644

of property during a public emergency, then the state may not be so quick to damage or destroy it, and such hesitancy risks catastrophe.

The idea that public emergency allows the government to damage or destroy property without compensation remained prominent after *Sparhawk*. For example, in 1822, a committee of the 17th Congress considered a petition for compensation from a Louisianan whose property was inundated due to American military action during the British invasion of Louisiana in 1814. *See* Property Destroyed During the Invasion of Louisiana by the British in 1814–'15, 17th Cong., 1st Session, No. 587 (1822).[4] As the congressional committee described, "the enemy had landed near the city of New Orleans, [and] in order to prevent him from bringing up his cannon and other ordnance to the city, General Morgan, commanding the Louisiana militia, caused the levee to be cut through at or near the plantation of the petitioner." *Id*. "In consequence, the petitioner suffered great losses in the destruction of his" property, to the tune of $19,250. *Id*. The congressional committee stated

> that this injury done the petitioner was done in the necessary operations of war, and that the United States are not liable for the individual losses sustained by that inundation; and therefore [the committee] recommend[s] the adoption of the following resolution: *Resolved*, That the prayer of the petitioner ought not to be granted.

*Id*.

Cases closer to the ratification of the Fourteenth Amendment demonstrate the longevity of the necessity privilege.[5] For example, in *Field v.*

_____

[4] Available at https://memory.loc.gov/cgi-bin/ampage?collId=llsp&file-Name=036/llsp036.db&Page=835.

[5] *See also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2163 (2022) (Barrett, J., concurring) (noting the "'ongoing scholarly debate on whether courts should

14

No. 22-40644

*City of Des Moines*, 39 Iowa 575, 577–78 (1874), a plaintiff sought to recover against the city of Des Moines after it razed his house to prevent further spreading of a fire. The Iowa Supreme Court explained,

> In Dillon on Municipal Corporations, Sec. 756, the learned author states the common law doctrine as clearly and succinctly as it is any where to be found. He says: "The rights of private property, sacred as the law regards them, are yet subordinate to the higher demands of the public welfare. *Salus populi suprema est lex.* Upon this principle, *in cases of imminent and urgent public necessity, any individual or municipal officer may raze or demolish houses and other combustible structures* in a city or compact town, to prevent the spreading of an extensive conflagration. This he may do independently of statute, and without responsibility to the owner for the damages he thereby sustains." The ground of exemption from liability in such cases is that of *necessity,* and if property be destroyed, in such cases, without any apparent and reasonable necessity, the doers of the act will be held responsible.

*Id.* (emphases in original). Much the same analysis is found in numerous cases from the mid-nineteenth century. *See, e.g.*, *McDonald v. City of Red Wing*, 13 Minn. 38, 40 (1868) (listing cases); *The Mayor, &C. of N.Y. v. Rufus L. Lord*, 18 Wend. 126, 132–33 (N.Y. 1837).

And when this same issue reached the Supreme Court in *Bowditch v. City of Boston* in 1879, only eleven years after the ratification of the Fourteenth Amendment, the Supreme Court explained:

> At the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part

---

primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791'").

of such destroyer, and no remedy for the owner. In the case of the Prerogative, 12 Rep. 13, it is said: 'For the Commonwealth a man shall suffer damage, as for saving a city or town a house shall be plucked down if the next one be on fire; and a thing for the Commonwealth every man may do without being liable to an action.' There are many other cases besides that of fire,—some of them involving the destruction of life itself,—where the same rule is applied. 'The rights of necessity are a part of the law.' *Respublica* v. *Sparhawk*, 1 Dall. 357, 362. See also *Mouse's Case*, 12 Rep. 63; 15 Vin., tit. Necessity, sect. 8; 4 T. R. 794; 1 Zab. (N. J.) 248; 3 id. 591; 25 Wend. (N. Y.) 173; 2 Den. (N. Y.) 461.

In these cases the common law adopts the principle of the natural law, and finds the right and the justification in the same imperative necessity. Burlem. 145, sect. 6; id. 159, c. 5, sects. 24–29; Puffendorf, B. 2, c. 6.

101 U.S. 16, 18–19 (1879).

*Bowditch* was a case about Massachusetts law, but its lessons have permeated the Federal Takings Clause context. Justice Holmes, for example, said:

The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go—and if they go beyond the general rule, whether they do not stand as much upon tradition as upon principle. *Bowditch v. Boston*, 101 U. S. 16, 25 L. Ed. 980.

*Pa. Coal Co.*, 260 U.S. at 415–16 (1922).

Indeed, whatever we might think about the principle underlying the necessity privilege, its basis in history and tradition is longstanding and long recognized. This recognition has extended to more recent precedents, as

well. *See, e.g.*, *United States v. Caltex*, 344 U.S. 149, 154-55 (1952) ("[T]he common law ha[s] long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved. . . . [And the] terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war."); *Lucas*, 505 U.S. at 1029 n.16 ("[The State may be absolved] of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others." (citing *Bowditch*, 101 U.S. at 18–19 and *United States v. Pac. R.R.*, 120 U.S. 227, 238–39 (1887))); *see also Steele v. City of Houston*, 603 S.W.2d 786, 792 (Tex. 1980) ("The defendant City of Houston may defend its actions by proof of a great public necessity. . . . Uncompensated destruction of property has been occasionally justified by reason of war, riot, pestilence or other great public calamity.").

d.

In sum, history, tradition, and historical precedent reaching back to the Founding supports the existence of a necessity exception to the Takings Clause. Today, we make no attempt to define the bounds of this exception. We hold only that in this case, the Takings Clause does not require compensation for Baker's damaged or destroyed property because, as Baker herself claims, it was objectively necessary for officers to damage or destroy her property in an active emergency to prevent imminent harm to persons. We need not determine whether the necessity exception extends further than this.

e.

We conclude by acknowledging two considerations that favor Baker's position, despite all we have said.

First, while scholars have converged on the empirical, historical thesis that a necessity exception to the Takings Clause has existed since the Founding, they have also tended to converge on the view that it wrongs individuals like Baker.[6] Second, and closely related, the Supreme Court has often stated that "[t]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960), *quoted in Tyler*, 598 U.S. at 647. This statement's relevance to Baker, who is faultless but must "alone" bear the burdens of a misfortune that might have befallen anyone, is manifest. As a lower court, however, it is not for us to decide that fairness and justice trump historical precedent, particularly Supreme Court precedent, where it has long recognized a necessity exception that excludes those like Baker from the protection of the Fifth Amendment's Takings Clause. Such a decision would be for the Supreme Court alone.

## IV.

Because Baker opted to pursue relief under § 1983, we do not reach whether she succeeds under the Texas Constitution.

---

[6] In particular, see Kuo, *Disaster Tradeoffs: The Doubtful Case for Public Necessity*, 54 B.C. L. Rev. 127 (2013), and Muller, *"As Much Upon Tradition as Upon Principle": A Critique of the Privilege of Necessity Destruction Under the Fifth Amendment*, 82 Notre Dame L. Rev. 481 (2006).

No. 22-40644

We REVERSE the district court's summary judgment order finding that the City's damaging or destroying Baker's house and personal property was a compensable taking under the Fifth Amendment. We therefore VACATE the § 1983 judgment in her favor and REMAND for further proceedings.